**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 18, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

CLAY O'BRIEN MANN,

        Defendant – Appellant.

No. 13-2214

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. 1:11-CR-01528-JAP-1)**

---

Brian A. Pori, Office of the Federal Public Defender, Albuquerque, New Mexico, for Defendant – Appellant.

David N. Williams, Assistant United States Attorney (Damon P. Martinez, United States Attorney, with him on the brief), Albuquerque, New Mexico, for Plaintiff – Appellee.

---

Before **KELLY**, **BACHARACH**, and **PHILLIPS**, Circuit Judges.

---

**PHILLIPS,** Circuit Judge.

---

A New Mexico grand jury charged Clay O'Brien Mann with eight counts, including three 18 U.S.C. § 924(c) violations, arising from his shooting three people on an Indian

reservation. He appeals his sole § 924(c) conviction, which arose from his assault and shooting of Paula Nez. As with the other two § 924(c) counts, the government charged that Mann had *knowingly* discharged a firearm *in relation to* his assaulting Paula Nez. Under Supreme Court precedent, the discharge need not be done either "knowingly" or "in relation to" the underlying crime of violence. Mann did not object to the district court's instructions ignoring these unnecessarily charged conditions. For the first time on appeal, Mann argues that the district court constructively amended his indictment by not instructing the jury that, to convict, it needed to find these conditions met. This, he says, was plain error and violated his Fifth and Sixth Amendment rights. We see no constructive amendment and thus no error. The charged but uninstructed language was mere surplusage to the true elements of the crime. Accordingly, we affirm the district court's conviction and sentence.

BACKGROUND

A. Trial Testimony

On July 23, 2010, late in the evening, Glenn and Paula Nez invited friends to join them at their undeveloped property to socialize as part of monthly fundraising for an upcoming Yeibichei (healing) ceremony. Glenn was scheduled to participate in the ceremony. About midnight, Glenn Nez called or texted Ames Jim to invite his wife and him to come participate. Ames and Cindy Jim were then visiting friends, Mark and Tina Bolding. Ames Jim was skilled at automobile-mechanic work, and was helping Mark Bolding repair a truck. After the two men finished repairing the truck, the two couples

drove together to the Nezes' undeveloped property. Once there, they joined a group of about 13 or 14 people, all peaceably drinking and visiting around a bonfire.

Earlier in the evening, at about 8:00 p.m., Mann had driven to his common-law wife's property adjoining the Nezes' land to feed his dogs.[1] At about 10:30 p.m., he returned to Farmington, New Mexico and bought alcohol. Mann was constructing a home on the property, but in the meantime he and his wife lived elsewhere.[2] He estimated that he returned to the property by the Nezes' at about 12:30 a.m. Alone at the property, he drank most of the alcohol and set off some fireworks. Consistent with this account, Paula Nez testified that about midnight she saw the neighbor (Mann) arrive at his adjoining property. Soon afterward, she saw a firework go off from near his house. She did not know Mann. Nor did Mann know the Nezes, but he took offense to their occasional gatherings.

Sometime about 2:30 a.m., as the Nezes and their friends continued visiting around the bonfire, Mann made his way to the fence-line separating the two properties and threw a lit artillery-shell firework into or near the bonfire. Mann watched the firework explode

---

[1] Some of this background comes from Mann's Mirandized statement to FBI agents two days after the shootings. At trial, the government introduced and played for the jury a recording of the interview, also supplying a written transcription. R. vol. I at 440. Although the government included information from this interview in its brief and cited to the page in the trial transcript where the video was played, the government did not include the recorded interview or the transcript for our consideration. We ordered them included as a supplemental record on appeal. Exercising his rights, Mann did not testify at trial.

[2] Although Paula Nez owned the adjoining property for a home site, the Nezes also were living elsewhere. On the property that evening was a small shack and some automobiles and bicycles.

and saw people running and screaming during the ensuing chaos. The firework's label warned users of its danger: "Must be used in a launcher tube. Warning: Shoots flaming balls." R. vol. I at 428. When properly launched, this powerful firework would rise 200–300 feet above the ground and explode.

At least three people ran toward the vicinity where Mann had thrown the firework on the other side of the property-line fence. Unknown to them, Mann stood near the fence with a rifle and loaded magazines of ammunition. Mann claimed in his interview that he first fired a warning shot in the direction of a man charging toward him, Ames Jim. He admitted centering the gun, firing again from his hip and striking Ames Jim. He heard Ames Jim wheezing from the gunshot, and shot him again. He claimed that when Ames Jim fell, he saw "a girl" fall behind him, Paula Nez. He expressed surprise that he had shot a third person, Mark Bolding. All told, Mann fired nine shots, two striking Mr. Jim in the cheek and chest (killing him), one striking Paula Nez in the neck, and one striking Mark Bolding in the face. Mann said that after this shooting spree, he walked the short distance back to his house, locked it, and slowly drove away in his car.

When Paula Nez first laid eyes on Mann by the fence, she thought she had heard fireworks, not gunshots. She verbally confronted Mann, saying words to this effect: "What are you doing? You shouldn't be around us. We don't know you. Get the hell out of here. You always been doing that, driving around us. You shouldn't be doing that." R. vol. I at 333. She testified that Mann turned around, pointed his rifle at her, and fired. As she lay on the ground shot, she saw Mann get in his car and drive away.

Tina Bolding and Cindy Jim took cover but watched the events unfold. Tina Bolding testified that she saw Paula Nez and her husband, Mark Bolding, fall after Mann shot them. She then poked her head out and watched Mann holding a rifle as he "patrolled" the fence line angrily shouting profanities. R. vol. I at 380. Cindy Jim testified that after they saw Mark Bolding and Paula Nez on the ground, they saw Mann shooting and yelling words to this effect: "[I'm] going to come back and shoot all of you, too[.]" R. vol. I at 269. Soon after that, Cindy Jim saw Mann drive away in his car.

At 6:28 a.m., about four hours after the shootings, law enforcement officers apprehended Mann after finding him asleep in his car. In the back lay a rifle and in Mann's jacket were four loaded magazines. A deputy sheriff testified that Mann was angry, yelling obscenities, and intoxicated in the patrol car. After seizing Mann's semiautomatic .22 caliber rifle and testing it against the shell casings found at the shooting, the FBI determined that Mann's rifle had fired the shots that killed Ames Jim and grievously wounded Mark Bolding and Paula Nez. Mann admitted as much in his FBI interview. Supp. R. at 15–16, 19, 26, 28.

B. Procedural History

In June 2011, a federal grand jury indicted Mann on eight counts arising from these shootings. This appeal focuses on counts 4 and 5 of the indictment. Count 4 charged Mann with assaulting Paula Nez, "such assault resulting in serious bodily injury." R. vol. I at 43–44. Count 5 charged a firearms offense arising from this assault:

> On or about July 24, 2010, in San Juan County, in the District of New Mexico, the defendant, Clay O'Brien Mann . . . **did**

> **knowingly discharge** and carry a firearm . . . during and **in relation to** a crime of violence, for which Clay O'Brien Mann . . . may be prosecuted in a court of the United States, namely, assault resulting in serious bodily injury as charged in Count 4 herein.
>
> In violation of 18 U.S.C. § 924(c)(1)(A)(iii).

R. vol. I at 44 (emphasis added). Mann's appeal concerns this emphasized language.

Although the district court did not instruct on "discharge,"[3] Mann's counsel told the district court that he had "no objections to the instructions as proffered by the court." R. vol. I at 592. Because Instruction 3 quoted the charging language for each of the indictment's eight charges, the jury had before it the full charge stated above. The jury convicted Mann on count 1, involuntary manslaughter of Ames Jim; count 2, a § 924(c) count incorporating count 1;[4] count 4, assault resulting in serious bodily injury to Paula Nez; count 5, a § 924(c) count incorporating count 4; and count 7, assault resulting in serious bodily injury to Mark Bolding. R. vol. I at 189–90.

Two weeks after the jury's verdict, Mann filed a "motion to arrest judgment." He argued that the district court must vacate his conviction under count 5 because a recently decided case, *Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013), required that the jury find "discharge" of a firearm. Because Mann had not objected to the court's jury instructions, the district court reviewed for plain error. To establish plain error, Mann

---

[3] Unlike "use," "carry," or "brandish"—legal terms needing defined in instructions to guide the jury—"discharge" needs no legal clarification. A firearm either discharges or not. The real problem in not "instructing on discharge" was that the district court failed to tell the jury that it must unanimously find discharge beyond a reasonable doubt.

[4] The district court later vacated Mann's conviction on count 2 after concluding that involuntary manslaughter is not a crime of violence as defined by § 924(c)(3).

needed to demonstrate: "(1) an error; (2) that is plain; (3) that affects substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Brown*, 400 F.3d 1242, 1253 (10th Cir. 2005).

Applying this analysis, the district court concluded that it had erred by "[f]ailing to instruct the jury on the element of discharging a firearm" and that this error was plain.[5] R. vol. I at 747–48. Specifically, it recognized that the Supreme Court in *Alleyne*—decided less than a month before the trial—had compelled that juries find § 924(c) sentencing enhancements beyond a reasonable doubt, overruling an earlier holding that permitted district judges to do so by a preponderance of the evidence. *See Alleyne*, 133 S. Ct. at 2155 (overruling *Harris v. United States*, 536 U.S. 545 (2002)). But addressing the third prong of plain-error analysis, the district court concluded that the error had not prejudiced Mann. In particular, the district court found it "highly unlikely that the jury verdict would have differed had the jury been properly instructed that discharging was an element of 18 U.S.C. § 924, because Defendant never contested that he fired shots." R. vol. I at 749.

The district court sentenced Mann to three concurrent terms of 51 months—the low end of the advisory-guidelines range—on his involuntary-manslaughter and two assault convictions. In addition, the court sentenced Mann to a consecutive term of 120 months

---

[5] The government argued that the district court had not erred, relying on the jury verdict form, which for count 5 read: "We, the jury, find the defendant, Clay O'Brien Mann . . . _____ of discharging a firearm in furtherance of an act of violence, as charged in Count 5 of the Indictment." R. vol. I at 189.

for his § 924(c) conviction incorporating his assault of Paula Nez.[6] Mann timely appealed.

DISCUSSION

A. <u>Plain Error Review</u>

Because Mann failed to raise the constructive-amendment argument in the district court, we review this claim for plain error. *United States v. Cavely*, 318 F.3d 987, 999 (10th Cir. 2003). To show plain error, Mann must demonstrate that there is "(1) an error; (2) that is plain; (3) that affects substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Brown*, 400 F.3d at 1253. If Mann satisfies all four prongs, we "may then exercise [our] discretion to notice [the] forfeited error." *United States v. Gonzalez Edeza*, 359 F.3d 1246, 1250 (10th Cir. 2004) (quoting *United States v. Edgar*, 348 F.3d 867, 871 (10th Cir. 2003)). "Meeting all four prongs is difficult, as it should be." *Puckett v. United States*, 556 U.S. 129, 135 (2009) (citation and internal quotation marks omitted). We will find plain error only when an error is "particularly egregious," and the failure to remand for correction would produce a "miscarriage of justice." *United States v. Frost*, 684 F.3d 963, 972 (10th Cir. 2012).

---

[6] But for a careless error by the government, Mann might well have had another consecutive 25-year term added to his sentence. *See* 18 U.S.C. § 924(c)(1)(C)(i). During its deliberations, the jury noticed something the government had not—count 8 premised its § 924(c) charge on an "assault resulting in serious bodily injury [to Mark Bolding] as charged in Count 6 herein," but the referenced assault was really charged not in count 6 but in count 7. After realizing the government's mistake, the district court dismissed without prejudice count 8, the § 924(c) charge based on Mann's assault on Mark Bolding resulting in serious bodily injury. R. vol. I at 186, 570–71.

B. Mann's Theory on Appeal

Mann argues that the district court constructively amended count 5 of his indictment by not instructing the jury that, to convict, it needed to find beyond a reasonable doubt that he *knowingly* discharged his firearm *in relation to* his assault of Paula Nez. To show the first two prongs of plain error (error that was plain), he relies on the district court's admitted *Alleyne* error and on Supreme Court cases prohibiting constructive amendments to indictments. To show substantial prejudice under plain-error's third prong, he argues that the jury may not have convicted him if instructed on count 5 as it was charged because the government failed to present overwhelming evidence in support. He maintains that his mistakenly shooting Paula Nez (as he claimed in his FBI interview) is inconsistent with "knowingly" discharging his rifle "in relation to" assaulting her. He argues that the jury may have believed his mistaken-shooting account because it acquitted him of assaulting her with *intent* to cause bodily injury.[7]  To meet plain-error's fourth prong, Mann argues that "permitting the jury to convict Mr. Mann of a broader offense than the one charged in the indictment must be said to have seriously affected the fairness, integrity, or public reputation of judicial proceedings." Appellant's Br. at 22.

---

[7] The district court instructed on assault as follows: "'Assault' means any intentional attempt, not because of accident or mistake, to inflict injury upon someone else, when coupled with an apparent present ability to do so, and includes any intentional display of force that would give a reasonable person cause to expect immediate bodily harm, whether or not the threat or attempt is actually carried out or the victim is injured." R. vol. I at 160.

C. Elements of § 924(c) Violations

The district court properly instructed the jury on the base elements of a § 924(c) violation.[8] By finding Mann guilty of that count, the jury necessarily found that Mann had knowingly carried a firearm during and in relation to a crime of violence prosecutable in a court of the United States. This alone required a five-year mandatory-minimum sentence.[9] *See* 18 U.S.C. § 924(c)(1)(A)(i). To trigger the mandatory-minimum ten-year sentence under § 924(c)(1)(A)(iii), the district court needed either (1) the jury's finding beyond a reasonable doubt that Mann had discharged a firearm during his assault

[8] For the three § 924(c) counts, the district court instructed that Mann had "used or carried" a firearm. R. vol. I at 162. The indictment did not charge that Mann had "used" the firearm. R. vol. I at 44. The district court got little help from the parties—Mann's proposed instructions recited "used" and ignored "carried," and the government's proposed instructions recited "used or carried." R. vol. I at 79, 116. This is not an issue on appeal, but we note for future cases that the government's failure to cross-reference its indictment and its jury instructions can cause unnecessary problems. The government's inattention also affected the jury verdict form, where the jury was asked if Mann had discharged his firearm "in furtherance" of an "act of violence" as charged in count five. Because Mann was not charged under the "possession in furtherance" prong of § 924(c), this language too was mistaken.

[9] In his briefing, Mann suggests that he could not be convicted of a § 924(c) offense if the jury found the base § 924(c) offense (knowingly carrying a firearm during and in relation to the crime of violence) but did not find "discharge" as charged in the indictment. If that is his position, we disagree with it. We acknowledge that *Alleyne* calls "brandishing" an "element" (Supreme Court's quotation marks) that must be submitted to the jury and describes as a "new, aggravated crime" the core crime plus the "fact triggering the mandatory minimum sentence." 133 S. Ct. at 2155, 2161. But we believe this simply means that without a jury's finding the aggravating fact beyond a reasonable doubt—except as *Recuenco* allows—the non-aggravated penalty applies. *See Alleyne*, 133 S. Ct. at 2164 (vacating sentence because jury had not found "brandishing" despite having a space to do so on the verdict form, and remanding for "resentencing consistent with the jury's verdict," meaning the base "use or carry" conviction under § 924(c) still stood despite the jury's rejecting the sentencing-enhancer for "brandishing"). *See also United States v. Alleyne*, No. 3:10-CR-00134-REP-1, Doc. No. 67 (Sept. 7, 2010) (verdict form).

of Paula Nez, *see Alleyne*, 133 S. Ct. at 2155, or (2) the district judge's own supportable finding that the jury would have done so based on overwhelming evidence, *see Washington v. Recuenco*, 548 U.S. 212, 220–21 (2006). *See also Neder v. United States*, 527 U.S. 1, 8–13 (1999) (concluding that harmless-error analysis applied to district court's failure to instruct on materiality, an element of the charged fraud offenses). As mentioned, the district court used the second option after failing the first. Mann does not address *Recuenco* or challenge that it permitted this. Instead, on appeal, he extends his argument past the district court's failure to instruct on mere discharge and argues that—once charged—the district court needed to instruct the jury that, to convict, it must find beyond a reasonable doubt that Mann "knowingly discharged" a firearm "in relation to" his assault on Paula Nez.

In *Dean v. United States*, 556 U.S. 568, 570 (2009), a bank robber accidentally discharged his firearm while reaching over a teller to collect money from her drawer. Because a firearm was discharged during the robbery, the district court imposed a ten-year mandatory minimum sentence as § 924(c)(1)(A)(iii) required. *Id.* at 571. On appeal, Dean argued that the sentencing enhancement "requires proof that the defendant intended to discharge the firearm." *Id*. Examining the statute's text, the Court disagreed, noting that "[i]t does not require that the discharge be done knowingly or intentionally, or otherwise contain words of limitation." *Id*. at 572. Mann acknowledges that *Dean* interprets § 924(c) to cover accidental discharges, but he asserts that the discharge must be "in relation to" the crime of violence. *Dean* itself forecloses this position, noting that "in relation to" modifies "only the nearby verbs 'uses' and 'carries.'" *Id.* at 573.

- 11 -

Consistently, the Court concluded that "[t]here is no basis for reading 'in relation to' to extend all the way down to modify 'is discharged.'" *Id.* Accordingly, the Supreme Court has expressly rejected as an element of § 924(c)(1)(A)(iii) a "knowing" discharge of a firearm "in relation to" the underlying crime of violence.

Undoubtedly, the government's charging language was far from ideal. The question Mann now raises is whether the government is stuck with its charged language (and the need to prove it) even though it exceeds the statutory elements.

D. Plain-Error Analysis

We begin our plain-error analysis of Mann's constructive-amendment argument by asking whether Mann can even show error. We note that he claims error based on "*Alleyne* and [*United States v.*] *Stirone*, [361 U.S. 212 (1960)], and this Court's decisions on constructive amendment of indictments. . . ." Appellant's Br. at 21. Accordingly, we evaluate each of these two distinct bases in determining whether the district court constructively amended his indictment contrary to law.

First, we observe that we have already concluded that the *Alleyne* error here—failure to instruct the jury that it must find discharge beyond a reasonable doubt—does not qualify Mann to any relief in view of the overwhelming evidence that he did discharge a firearm during the assaults. In fact, in his recorded FBI interview—played for the jury— Mann admitted several times that he had discharged his firearm. On appeal, Mann concedes that "the jury would have found the mere fact of discharge of a firearm on Count 5." Appellant's Rep. Br. at 3.

Thus, despite the district court's failure to instruct the jury that it must find that Mann had discharged a firearm, the error was harmless beyond a reasonable doubt because overwhelming evidence established the "discharge." *See Recuenco*, 548 U.S. at 214–15 (affirming enhanced sentence for second-degree assault with a firearm despite the jury's not being presented the question whether the assault was with a "firearm" instead of a generic "deadly weapon," because the government had introduced overwhelming evidence that defendant had in fact used a firearm during the assault); *United States v. Pizarro*, 772 F.3d 284, 287 (1st Cir. 2014) (affirming enhanced drug sentence despite error in not instructing the jury on individualized drug quantity for aggravated conspiracy count and aggravated possession count after concluding "beyond a reasonable doubt that the omitted element[s] [were] uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error[s]"); *United States v. King*, 751 F.3d 1268 (11th Cir. 2014) (affirming enhanced § 924(c) sentence for brandishing a firearm despite *Alleyne* error because video surveillance and victim testimony made it "clear beyond a reasonable doubt that a rational jury would have found King guilty of brandishing a firearm absent the *Alleyne* error."); *United States v. Cureton*, 739 F.3d 1032, 1046 (7th Cir. 2014) (affirming on same basis because it was highly unlikely that a jury would not have found brandishing based on the victim's testimony that defendant had held a gun to her head); *United States v. Mack*, 729 F.3d 594, 606–09 (6th Cir. 2013) (affirming on same basis because "the jury would have found beyond a reasonable doubt . . . that the defendant brandished a firearm during the robberies. . . .").

Having lost on *Alleyne*, and having conceded that issue rather than appeal it, Mann cannot uproot the first two prongs of plain error from the district court's *Alleyne* analysis and replant them in his constructive amendment analysis. The two claims of error are distinct. Even so, the government endorses Mann's shortcut, conceding that Mann can satisfy the first two prongs of plain error for his constructive-amendment argument by transplanting the conceded *Alleyne* error. This concession is mistaken. Even if Mann were allowed to use an error under one theory to establish error under a different theory, he would still fail. *Alleyne* does not require a district court to instruct that a jury must find that a defendant "knowingly discharged" a firearm "in relation to" an underlying crime of violence. The error he claims under *Alleyne* is not the error needed to show a constructive amendment.

Second, we reject Mann's argument that under Supreme Court cases the district court impermissibly constructively amended the indictment. In making his constructive-amendment argument, Mann first and primarily relies on *Ex parte Bain*, 121 U.S. 1 (1887). He analogizes his case to *Bain*, focusing on *Bain*'s reversing a district court for striking extraneous language from an indictment. Specifically, as here, the government in *Bain* charged conduct unneeded to sustain its statutory burden. There, the government charged that the defendants had made a "false statement and report in manner and form . . . with intent to deceive *the comptroller of the currency and* the agent appointed to examine the affairs of said association. . . ." *Id.* at 4 (emphasis in original). The district court struck the italicized language from the indictment because nothing in the criminal statute required intent to deceive the comptroller of currency. *Id*.

On appeal to the Supreme Court, the defendant argued that the district court had constructively amended the indictment. The government opposed this by contending that the stricken language was "surplusage" and that "the grand jury would have found the indictment without this language." *Id.* at 9. The Supreme Court rejected the government's approach, concluding that it was not for the Supreme Court to "say whether [the grand jury] would or not [have indicted]" and that "[t]he party can only be tried upon the indictment as found by such grand jury, and especially upon all its language found in the charging part of that instrument." *Id*. at 9–10.

If *Bain* were still good law on this point, Mann might well prevail. But it is not. Although Mann acknowledges *United States v. Miller*, 471 U.S. 130 (1985), in his brief, he fails to give the case its full import. In *Miller*, a unanimous Court addressed *Bain* head-on, restating *Bain*'s second proposition[10] before rejecting it: *Bain* can support the proposition that the striking out of parts of an indictment invalidates the whole of the indictment, for a court cannot speculate as to whether the grand jury had meant for any remaining offense to stand independently, even if that remaining offense clearly was included in the original text. *Id.* at 142.

Reviewing its post-*Bain* cases, the Court noted that "when defendants have sought to rely on *Bain* for this point, this Court has limited or distinguished the case, sustaining convictions where courts had withdrawn or ignored independent and unnecessary

---

[10]*Bain*'s first proposition against broadening an indictment still holds. That proposition relates not to a district court's striking surplusage from an indictment but to a conviction's being "based on an offense that is different from that alleged in the grand jury's indictment." *Miller*, 471 U.S. at 142.

allegations in the indictments." *Id.* at 144 (citing *Ford v. United States*, 273 U.S. 593, 602 (1927), and *Salinger v. United States*, 272 U.S. 542, 549 (1926)). In "explicitly rejecting" *Bain*'s second proposition, the *Miller* Court noted that the case "has simply not survived" and rejected any notion that it is "an unconstitutional amendment to drop from an indictment those allegations that are unnecessary to an offense that is clearly contained within it. . . ." *Id.* at 144.

Faced with *Miller*'s plain holding, Mann refers us to *Stirone*, 361 U.S. at 218–19, which preceded *Miller* by 25 years. Nothing in that case supports Mann's constructive-amendment argument. *Stirone* addressed *Bain*'s first proposition, which *Miller* left intact. Specifically, *Stirone* disallowed the government from broadening its indicted Hobbs Act count at trial. *Id.* at 219. Although the government charged that the defendant had impeded commerce by delaying shipments of ready-mix concrete across state lines for use in erecting a steel plant, the government sought to convict on an uncharged theory— that he had impeded interstate commerce by interfering with steel shipments between states. *Id.* at 213. *See also United States v. Farr*, 536 F.3d 1174, 1180 (10th Cir. 2008) (reversing district court for allowing government to broaden charges from willfully evading quarterly employment tax to failure to pay trust-fund recovery penalty). Mann does not argue that the district court erred in this fashion. Instead, he argues a broadening-by-subtraction position that *Miller* expressly rejected.

Nor has our court been slow to recognize the difference between cases involving *Bain*'s first and second propositions. Consistently with *Miller*, we have rejected *Bain*-arguments similar to the one Mann makes here. *See, e.g.*, *United States v. Smith*, 838 F.2d

436, 439–40 (10th Cir. 1989) (limiting necessary proof to the elements of the offense and not finding a constructive amendment by not requiring the government to prove surplusage from the indictment—that invoices were for amounts "intended for [defendants'] *personal use unrelated to said project*") (emphasis original).

We conclude that Mann fails even to show error, the first of the four needed showings to establish plain error. Thus, we have no need to address the third or fourth prongs of plain-error analysis. *See United States v. Pablo*, 696 F.3d 1280, 1301 (declining to address other prongs of plain-error review because defendant failed on the third prong).

## CONCLUSION

We therefore hold that Mann's conviction on count 5 and its resulting sentence are lawful, and we AFFIRM the judgment of the district court.