**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 24, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MARVIN LEE ELLIS,

    Defendant - Appellant.

Nos. 14-3165 & 14-3181

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. Nos. 2:12-CR-20066-KHV-JPO-30 and 2:06-CR-20180-KHV-1)**
_____

Rabindranath Ramana, Calvert Law Firm, Oklahoma City, Oklahoma, for Defendant-Appellant.

Carrie N. Capwell, Assistant United States Attorney (Barry R. Grissom, United States Attorney, with her on the brief), United States Attorney's Office, Kansas City, Kansas, for Plaintiff-Appellee.

_____

Before **HARTZ** and **PHILLIPS**, Circuit Judges.[*]

_____

[*] The Honorable Neil Gorsuch heard oral argument but did not participate in this opinion. The practice of this court permits the remaining two panel judges, if in agreement, to act as a quorum in resolving the appeal. *See* 28 U.S.C. § 46(d); *see also United States v. Wiles*, 106 F.3d 1516, 1516 n.* (10th Cir. 1997) (noting this court allows remaining panel judges to act as a quorum to resolve an appeal); *Murray v. Nat'l Broad. Co.*, 35 F.3d 45, 48 (2d Cir. 1994), *cert. denied*, 513 U.S. 1082 (1995) (remaining two judges of original three judge panel may decide petition for rehearing without third judge).

**PHILLIPS**, Circuit Judge.

_____

In 2009, law-enforcement officials began investigating a Mexican cocaine-trafficking operation extending into the Kansas City area. This led them to several suspects, including Marvin Ellis, a low-level powder-cocaine buyer, who was working with two others to buy powder cocaine and cook at least some of it into cocaine base (crack cocaine) for resale. In 2012, Kansas police arrested Ellis after he fled from a traffic stop. At arrest, Ellis had a stolen handgun, miscellaneous drugs, and some drug-dealer paraphernalia. Later, based on this and separate evidence from the federal investigation, a federal grand jury charged Ellis with several drug and firearm felonies. The most serious charge against Ellis was for his conspiring with 49 other persons to manufacture, distribute, or possess with the intent to distribute at least 5 kilograms of powder cocaine and 280 grams of crack cocaine.

After the jury convicted Ellis on all charges, the district court imposed consecutive sentences for the cocaine-conspiracy count and a firearm count and concurrent sentences for the remaining counts. Ellis received a sentence of life without release on the cocaine-conspiracy count (after applying a sentencing enhancement under 21 U.S.C. § 851 for his two earlier felony-drug-offense convictions), a mandatory-minimum five-year term for possession of a firearm in furtherance of a drug-trafficking crime under § 924(c), and statutory maximum sentences on all remaining counts. Later, the district court revoked Ellis's supervised

2

release from a 2007 federal conviction and sentenced him to an additional consecutive 24 months' imprisonment.

Ellis now appeals some of his convictions and sentences. In Appeal No. 14-3165, Ellis (1) challenges his convictions under 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A), 18 U.S.C. § 924(c), and 21 U.S.C. § 856; (2) argues that his life sentence for the conspiracy conviction violates the Fifth and Sixth Amendments; and (3) argues that the district court violated his Sixth Amendment right to counsel at sentencing. In Appeal No. 14-3181, Ellis challenges the consecutive sentence for his supervised-release violation, based on the district court's denying him substitute counsel.

In Appeal No. 14-3165, we affirm all of Ellis's convictions and all of his sentences except one. Though we affirm Ellis's cocaine-conspiracy conviction, we reverse its accompanying life-without-release sentence because (1) the jury never found that Ellis was individually responsible for the charged amounts of powder or crack cocaine, either from his own acts or the reasonably foreseeable acts of his coconspirators; and (2) the government's evidence does not show that omitting this element was harmless beyond a reasonable doubt. In Appeal No. 14-3181, we affirm Ellis's sentence for violating his supervised release. We remand to the district court for a full resentencing, subject to resentencing on the cocaine-conspiracy count under 21 U.S.C. § 841(b)(1)(C).

3

## BACKGROUND

### I. The Investigation

In 2009, Drug Enforcement Administration (DEA) agents began investigating a Mexican cocaine-trafficking network that was supplying the Kansas City area. Agents learned that Mexican drug sources were shipping multi-kilogram deliveries of powder cocaine from Mexico into and near Kansas City. In addition, agents learned that some of this powder cocaine was going to local drug dealers, including Djuane Sykes, who was selling large amounts of cocaine to several customers from the 2200 block of Russell Avenue in Kansas City, Kansas.

Among Sykes's many customers were Ataven Tatum and Marvin Ellis. In August 2011, Ellis had been released from prison to supervised release after serving time on a 2007 conviction for violating 18 U.S.C. § 924(c). By November 2007, Ellis had begun working with Tatum and Ellis's nephew, Theoplis Ellis (Theoplis), to buy powder cocaine from Sykes and cook at least some of it into crack cocaine for sale to their customers. Over the next few months, the three men worked together to sell drugs, including crack cocaine. They sold the drugs from different locations, including from a house at 921 Haskell Avenue. In October 2011, Ellis leased this residence, and in November, Tatum signed a contract for deed to buy it.

### II. Ellis's Arrest

In late April 2012, a Kansas City, Kansas police officer, Patrick Locke, stopped Ellis for a traffic violation. After first pulling over to the roadside, Ellis sped

4

away when Office Locke's partner approached the car. Officer Locke gave chase until Ellis crossed the Kansas state line into Missouri.

Two weeks later, just after midnight on May 11, Officer Locke again stopped Ellis for a traffic violation. As before, Ellis pulled over but then sped away. Again, Officer Locke chased Ellis, this time at speeds up to 80 miles per hour. The chase ended when Ellis lost control of his car after it hit a curb. When his car came to rest, Ellis jumped from it and ran. During the ensuing foot chase, Officer Locke saw that Ellis was carrying a green plastic bag. When Ellis was subdued on the ground, Officer Locke saw Ellis holding his right hand in his waistband—causing Officer Locke to fear that Ellis had a gun. Officer Locke tasered Ellis, yet Ellis refused commands to remove his hand from his waistband. When Officer Locke threatened to shoot Ellis, Ellis dropped the green bag and threw a pistol about 10 to 15 feet away.

After finally subduing and arresting Ellis, Officer Locke gathered Ellis's thrown gun—a stolen, loaded .40 caliber pistol. Officer Locke also collected Ellis's discarded green bag, which contained an empty sandwich-bag box, a digital scale, 2.5 grams of powder cocaine, about 32 grams of synthetic marijuana, 25.8 grams of PCP in a bottle, 3.1 grams of marijuana, 16 mollies (ecstasy/MDMA), and 8 Diazepam pills.

III. **The Charges**

In October 2012, a grand jury sitting in the District of Kansas issued a sweeping 112-count Second Superseding Indictment against 51 defendants, including

Ellis, Tatum, and Theoplis.[1] In a vast cocaine-conspiracy count under 21 U.S.C. § 846, naming 50 defendants including Ellis (reaching all the way up to the Mexican cartel), the grand jury charged that the 50 defendants

> [k]nowingly and intentionally conspired and agreed together and with each other, and with other persons known and unknown to the Grand Jury, to commit the following offenses against the United States: to manufacture, to possess with intent to distribute and to distribute 280 grams or more of cocaine base, "crack," a controlled substance; and to possess with intent to distribute and to distribute five kilograms or more of a mixture and substance containing cocaine, a controlled substance; all in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A)(ii), (b)(1)(A)(iii) and Title 18, United States Code, Section 2.

R. vol. I (3165) at 547.

Eight months after filing the Second Superseding Indictment, the government filed an Information under 21 U.S.C. § 851 to enhance Ellis's sentence. Because Ellis had two earlier convictions for felony drug offenses, the § 851 Information subjected him to an increased mandatory sentence—life without release—if he was convicted and sentenced for the conspiracy charge under 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(A).[2]

The Second Superseding Indictment also charged Ellis with six counts of knowingly and intentionally distributing crack cocaine, in violation of 21 U.S.C. §

---

[1] The Second Superseding Indictment charged additional defendants in the conspiracy count. The conspiracy count included Ellis each time, and the substance of the charge remained the same.

[2] The government listed two state felony drug convictions necessary to trigger the enhancement: one for felony possession of cocaine in 1997, and another for selling cocaine in 2003.

841(a)(1) and (b)(1)(C), and aiding and abetting those offenses, in violation of 18 U.S.C. § 2; one count of maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1)–(2); one count of knowingly and unlawfully possessing a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c); and one count of possessing a firearm as a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e).

## IV.    Trial

Ellis was tried with several coconspirators, some of whom pleaded guilty during the trial. In the end, Ellis proceeded to a jury verdict with three others: Robert Vasquez, Vernon Brown, and Kyle Stephen.

### A.    Conspiracy Evidence

The government sought to prove the cocaine-conspiracy count against Ellis by the testimony of several witnesses, including three cooperating witnesses, four law-enforcement officers who had arranged the controlled buys of crack cocaine from Ellis and Tatum, and other law-enforcement officers who had participated in the investigation.

One government witness, Djuane Sykes, testified that he knew Ellis, Ataven Tatum, and Theoplis. Sykes said that in late 2011, Ellis and Tatum approached him to buy powder cocaine for resale. At this meeting, Sykes sold Ellis an ounce of cocaine for $700. Sykes also testified that Ellis—either for himself or for Tatum—continued to buy powder cocaine from him. Sykes said that Ellis sometimes bought half or full ounces of powder cocaine. Sykes never said how many times Ellis alone had bought

7

powder cocaine from him. But Sykes did say that Ellis, when with Tatum, had bought powder cocaine from him "[m]aybe ten or 15 times." R. vol. IV (3165) at 1590. Each time, Ellis bought between a "half-ounce to a [sic] ounce of cocaine." *Id.* at 1589. In addition, Sykes said that Tatum bought a "half-ounce to three ounces" of powder cocaine from him "once or twice a week." R. vol. IV (3165) at 1587. Sykes also said that Tatum sent Ellis or Theoplis to pick up cocaine "[p]robably four or five times." *Id.* at 1590.

Another government witness, Ralph Mayo, was a local drug dealer who confirmed that Ellis, Tatum, and Theoplis had bought powder cocaine from Sykes. Mayo testified that he had seen Ellis "a few times" buying cocaine from Sykes. R. vol. V (3165) at 1233. In addition, Mayo testified that Mayo had sold "probably between a [sic] ounce or two ounces" of powder cocaine to Ellis "[p]robably not more than two times." *Id.* at 1234–35.

A third government witness, Theoplis, testified about his drug activities with Ellis and Tatum. Theoplis recalled once going with Ellis to buy powder cocaine from Sykes. In addition, Theoplis recalled that Tatum and Ellis had sent him to Sykes "two or three times" to pick up powder cocaine. *Id.* at 677. Though Theoplis did not say how much cocaine he bought during his solo trips or during his single trip with Ellis, he did say that he picked up "three and a half ounces, four" when Tatum and Ellis sent him to Sykes. *Id.* at 6776.

Theoplis also testified that Tatum and Ellis cooked the powder cocaine into crack cocaine. The prosecutor asked, "once the powder cocaine was purchased, was it

8

always cooked into crack cocaine?" Theoplis answered, "Yes, ma'am." *Id.* at 678. He further testified that after Tatum and Ellis bought powder cocaine from Sykes, they would "go back and cook the crack and cook the soft to hard." *Id.* at 673–74. But on cross-examination by Ellis's attorney, Theoplis admitted that he had seen Ellis cook crack cocaine just once, at Theoplis's father's house. Theoplis also answered affirmatively to the prosecutor's question asking him if he, Tatum, and Ellis had sold only crack cocaine and not powder cocaine. Theoplis never said how many times he sold crack cocaine, but he did say he sold "pieces" for ten or twenty dollars. *Id.* at 683.

The government called Kansas City police officer Nathan Doleshal to testify about the controlled buys he had arranged in which informants bought crack cocaine from Ellis, Tatum, and Theoplis[3] at 921 Haskell and elsewhere.[4] During the controlled buys, an informant typically called Tatum or Ellis to arrange the buy and then bought the crack cocaine from either one or both of them. During the first controlled buy, on February 7, 2012, an informant bought 0.9 grams of crack cocaine from Ellis at 921 Haskell. The next day, the same informant bought another 0.7 grams of crack cocaine from Ellis and Tatum at 921 Haskell. On February 9, an informant bought 2.5 grams of crack cocaine from Ellis and Tatum, this time at a local grocery store. On February 10, informants bought 9.9 more grams of crack

---

[3] Theoplis usually acted as a "doorman," letting the informant-buyers into the house and taking them to Ellis and Tatum. R. vol. II (3165) at 119.

[4] The record is unclear about the participants in and locations of some controlled buys.

9

cocaine, this time purchased at an intersection and later another 1.2 grams of crack, this time at 921 Haskell.

Law-enforcement officers also testified about more controlled buys in March 2012. On March 20, 2012, at a local pharmacy, an informant bought 3.4 grams of crack cocaine from Ellis. On March 23, at a local street intersection, an informant bought 6.7 grams of crack cocaine and some ecstasy pills from Ellis. All told, the controlled buys totaled 25.3 grams of crack cocaine.[5]

## B.    Evidence of Drug-Involved Premises

The government produced evidence that Ellis had maintained 921 Haskell as a place for manufacturing and selling crack cocaine. Although not specifying dates, Theoplis testified that Ellis had lived at 921 Haskell and sold crack cocaine, ecstasy, PCP, and marijuana there. Three of the controlled buys from Ellis happened at 921 Haskell, the last occurring on February 10, 2012. The government also produced wiretapped phone calls (some in March and April 2012) in which Ellis, Tatum, and Theoplis arranged crack-cocaine sales, and one call in which "[t]his young lady's [sic] called Ataven [Tatum] to pretty much tell her [sic] that Messy or Marvin Ellis was wanting some supplies to cook crack cocaine." *See* R. vol. III (3165) at 2270-88. In particular, Ellis supposedly was seeking a whisk to "blend the ingredients together." *Id*. at 2270.

---

[5] The record is unclear why the officers stopped the controlled buys so close to 28 total grams of crack cocaine, which would have activated a mandatory-minimum sentence under 21 U.S.C. §§ 851, 841(a)(1), (b)(1)(B).

10

The evidence further showed that in October 2011, Ellis signed a lease agreement for 921 Haskell. The lease required Ellis to pay a $300 deposit and $600 for the first month's rent. Of this amount, Ellis paid $400, and Tatum paid $500. The next month, Tatum signed a contract for deed to buy the residence. When police officers searched 921 Haskell on May 30, 2012, they found a utility bill for service from April 13 to May 14, 2012, in Ellis's name. Though police had arranged controlled buys at 921 Haskell during this billing period, Ellis was not present for them—he had left the house after a falling out with Tatum. In an intercepted phone call on April 12, a caller asked Tatum "how Marvin Ellis is doing," and Tatum responded that he had put Ellis out of the house. R. vol. III (3165) at 2287.

**C.      Evidence of Firearm Possession in Furtherance of Drug Trafficking**

Officer Locke testified that at the arrest, Ellis had a stolen, loaded .40 caliber pistol, along with several kinds of illegal drugs, an empty sandwich-bag box, and a digital scale. Officer Locke testified that drug dealers use these items for drug sales. Theoplis testified that he had previously seen Ellis with this same pistol when selling drugs at 921 Haskell.

**D.      Jury Instructions and Verdict Form**

Before closing arguments, counsel met with the district judge about jury instructions and a verdict form. During this conference, the district court remarked that it had "e-mailed a draft copy of the verdict [form] to all of the counsel of record." R. vol. V (3165) at 1452. The district court further mentioned that "the main feedback we got was that the verdict form should not include the drug amounts and I

11

think that feedback is correct. So we've prepared a revised verdict form which omits any reference to the drug quantities." *Id.* The district court did not identify which counsel had provided this feedback.[6]

After this, the district court asked all counsel, "Is there any objection to the revised form of the verdict?" *Id.* No one objected. In particular, Ellis's counsel responded, "None on behalf of Mr. Ellis, Your Honor." *Id.* Thus, for the cocaine-conspiracy count, the final verdict form asked the jury to determine Ellis's guilt only in the broad conspiracy and did not require the jury to say how much powder or crack cocaine it attributed (1) to the entire conspiracy or (2) to Ellis from his own acts and the reasonably foreseeable acts of his coconspirators.

The jury instruction for the cocaine-conspiracy count listed the elements that "the government must prove beyond a reasonable doubt," including one element requiring proof that "[t]he overall scope of the agreement involved more than 5 kilograms of cocaine or more than 280 grams of cocaine base, 'crack.'" R. vol. I (3165) at 1510. Another element required that "[w]hen defendant joined, he knew the essential objective of the agreement was to manufacture, to possess with intent to distribute or to distribute controlled substances in violation of federal drug laws[.]" *Id.* The next instruction stated that "[o]nce a person becomes a member of a conspiracy, he . . . is legally responsible for the acts of all other members in furtherance of the conspiracy, even if he . . . was not present or aware that the

---

[6] The record does not reveal which of the multiple counsel submitted proposed verdict forms to the district court, let alone whether any of those included spaces for the jury to individually attribute cocaine amounts to each defendant.

12

specific acts were being committed." *Id.* at 1513. Ellis did not object to these instructions. No instruction addressed reasonable foreseeability.

### E.      Opening Statement and Closing Arguments

In its opening statement and closing argument, the government argued Ellis's guilt based largely on the acts of the Mexican cocaine sources, including those sources supplying powder cocaine to Sykes.

For instance, in its opening statement, the government named Ellis as one of "a variety of individuals who were engaged in drug trafficking in the Kansas City metropolitan area," and then stated that "Mexican cartels use these public roadways to have large amounts of drugs transported from Mexico into the United States by a variety of ways." R. vol. III (3165) at 445. The government spoke about "trusted couriers based from cell heads" who were distributing drugs and "polluting our community." *Id.* at 445–46. It said that "[m]illions of dollars of drugs are coming in and millions of dollars of money are going out." *Id.* at 446. It tied small-time distributors of the cocaine—"street level dealers to mid-level dealers to large scale dealers"—to the cartel's supply. *Id.*

And in its closing argument, the government returned to this theme, emphasizing the conspiracy-wide amounts of cocaine:

> And I assert to you that it's not important that any particular defendant knew much at all about the overall scope of the conspiracy. It's irrelevant that Marvin Ellis didn't know a single Hispanic person on that chart. What's important is that any reasonable person knows that drugs like cocaine come from a source. And it's reasonable to conclude that the source would be a Hispanic source.

13

R. vol. V (3165) at 1475–76. For interdependence, the government asserted a relationship

between Ellis and the cartel and its suppliers:

> The suppliers rely upon people like Robert Vasquez to make sure that they can keep up getting a supply. Without people like Robert Vasquez taking money loads back to the south, they're [sic] aren't going to be sending up anymore [sic] supply. And without customers like Kyle Stephen and Vernon Brown and Marvin Ellis, the suppliers aren't going to have a business.

*Id.* at 1476.

In his closing argument, Ellis's counsel tried to counter this by arguing that

Ellis was a "very, very small minnow in a very large ocean and he is nowhere near at

the level of the great white sharks that [the government] paraded through that witness

stand." *Id.* at 1515.

But in rebuttal, the government responded that "it doesn't matter if you're a

little person, if you're a bottom feeder, you're still guilty of the conspiracy." *Id.* at

1558–59. The government stressed that it is "[p]eople like Marvin Ellis and Vernon

Brown that keep people like Hector Aguilera in business." *Id.* at 1568. The

government had earlier described Hector Aguilera as the "kingpin." *Id.* at 1482. It

described the "scope of the overall conspiracy" as the quantities charged in the

indictment, "[n]ot what each individual person was involved with." *Id.* at 1563.

## V.     Ellis's Request for New Counsel

While the probation office was completing its Presentence Investigation

Report (PSR), Jay DeHardt, Ellis's counsel, moved to withdraw. DeHardt told the

district court that Ellis had refused to read the PSR and had demanded that DeHardt

14

no longer represent him. DeHardt told the court that Ellis had even accused him of conspiring with the government to convict him. In short, DeHardt said that Ellis refused to listen to him or cooperate.

At a hearing on the motion, Ellis expressed his dissatisfaction with DeHardt's trial performance, complaining that DeHardt had not challenged the length of time in which Ellis was involved in the conspiracy and had not separated him from the broad conspiracy. Ellis asked the district court to appoint new counsel. The district court denied Ellis's request. The court acknowledged the breakdown of communication between Ellis and DeHardt but found Ellis responsible for "not reasonably trying to communicate" with DeHardt or to help DeHardt prepare a defense. R. vol. V (3165) at 1613. With that, the district court granted DeHardt's motion to withdraw.

The district court then gave Ellis two options: he could hire a different attorney, or he could represent himself. The court strongly advised Ellis against self-representation and questioned Ellis's decision to proceed pro se:

| Court: | Do you want to represent yourself or do you want to hire an attorney? |
|---|---|
| Ellis: | I don't have any money right now. |
| Court: | Okay. Then your choice is to stay with Mr. DeHardt and work with him or represent yourself. |
| Ellis: | He's not working with me, Judge. |
| Court: | That is—I heard all I need to hear about that. Do you want to stay with him and cooperate and help him represent you or do you want to represent yourself? |
| Ellis: | I represent myself. |

15

Court:      Okay. Then, Mr.—Do you want him to be available as stand-by counsel if you have questions?

Ellis:      I hope he wish me the best.

Court:      Do you want him to represent—to be available as stand-by counsel to answer any questions you may have?

Ellis:      No, ma'am.

Court:      Okay. Then, again, I think this is an incredibly poor decision on your part, but I find that you have voluntarily and knowingly given up your right to counsel in this case and I will let you represent yourself for the purposes of sentencing and appeal.

*Id.* at 1629–30.

Before the sentencing hearing, Ellis twice renewed his motion to appoint him new counsel. In response to the first motion, the district court reappointed DeHardt, who moved to withdraw a month after his reappointment. DeHardt told the court that his attorney-client relationship with Ellis was "beyond resurrection." R. Vol. 1 at 1547. At the sentencing hearing, the district court denied Ellis's second motion because Ellis had failed to cooperate and because it believed that a newly appointed attorney would take months to become sufficiently acquainted with Ellis's case.

## VI. Sentencing

Ellis represented himself at the sentencing hearing. He objected to several paragraphs in the PSR, most of which concerned the facts underlying his conviction. After hearing Ellis's objections, the district court denied them. Ellis also objected to the sentence enhancement under 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 851. The district court rejected this argument too. Before the district court imposed a sentence,

16

Ellis reiterated his request that the court appoint him new counsel. The court declined to revisit that issue.

On the cocaine-conspiracy count, the district court sentenced Ellis to life imprisonment without release—the sentence mandated by 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A) and 851. In addition, the district court sentenced Ellis to the statutory maximum on all of his other convictions: 360 months for each of the six cocaine-possession and cocaine-distribution convictions, concurrent with each other and the life sentence; 240 months for the drug-involved-premises conviction, concurrent with the other sentences; and 120 months for the felon-in-possession-of-a-firearm conviction. Finally, the district court sentenced Ellis to the mandatory-minimum sentence of 60 months for the § 924(c) offense of possessing a firearm in furtherance of a drug-trafficking crime. Ellis timely appealed.

## VII.   Revocation of Ellis's Supervised Release

Soon after the sentencing hearing, the district court held a hearing on the government's motion to revoke Ellis's supervised release imposed for his § 924(c) conviction in 2007. At this hearing, DeHardt represented Ellis, and Ellis again requested appointment of a different attorney. In response, the district court gave Ellis the same option it had given him at sentencing: he could proceed with DeHardt, or he could proceed pro se. Ellis elected to "go pro se." R. vol. II (3181) at 17. Before the revocation hearing began, the district court questioned Ellis about (1) his legal experience, (2) the penalty he was facing if the court revoked supervised release, (3) his awareness that he would have no help during the hearing, and (4) his

17

knowledge that he could have DeHardt represent him at the hearing. The district court strongly urged Ellis "not to try to represent [himself]." *Id.* at 21. Despite this, Ellis chose to represent himself, and the district court found that Ellis had "knowing [sic] and voluntarily given up [his] right" to counsel. *Id.*

Ellis did not contest that he had violated the terms of his supervised release. He asked only that the district court order any resulting prison sentence to run concurrently with his other sentences. Instead, the district court sentenced Ellis to a consecutive term of 24 months' imprisonment to the sentences he received in Appeal No. 14-3165. Ellis has appealed his conviction and sentence for violating his supervised-release terms.

## DISCUSSION

### I. Conspiracy Conviction

#### A. District-Court Proceedings

As noted, the government charged Ellis and 49 other defendants in a broad cocaine-distribution conspiracy stretching from a Kansas City street corner to a drug cartel in Mexico. In its jury instructions, the district court did not tell the jury to determine what cocaine amounts were individually attributable to Ellis, by his own acts and the reasonably foreseeable acts of his coconspirators. And such an instruction would not have mattered anyway, because the district court did not furnish the jury a special-verdict form on which to enter those findings.

Though the government offered some crack-cocaine evidence, it sought Ellis's conviction primarily by arguing that he was necessarily responsible for the cocaine

18

kilograms trafficked into the area by the Mexican cartel. The government did so even though acknowledging that Ellis knew no one in the chain above his street supplier, Djuane Sykes. From its opening statement through its closing arguments, the government pressed a Mexican-cartel theme.

With this general-verdict form, the jury found Ellis guilty by checking the space next to "guilty." R. vol. I (3165) at 1483. As mentioned, the verdict form provided no spaces by which the jury could say what amount of cocaine powder or crack cocaine the entire conspiracy involved, and no spaces to say what amounts it attributed individually to Ellis. As seen, the jury instruction had an "in furtherance" requirement for coconspirator acts, but it lacked a reasonable-foreseeability requirement. *Id.* at 1513. The general-verdict form underlies Ellis's challenge to his conviction and sentence on the cocaine-conspiracy charge.

## B. Ellis's Contentions on Appeal

### 1. Sufficiency of the Evidence

Ellis first asks us to vacate his conspiracy conviction. He contends that the government presented insufficient evidence "to establish that the possession, distribution, or manufacture of either 280 grams of crack cocaine or five kilograms of powder cocaine was reasonably foreseeable to Mr. Ellis." Appellant's Opening Br. at 16. Ellis argues that the district court erred in not requiring that the jury convict him for only the amounts it found reasonably foreseeable to him.[7] And, further, Ellis argues that the jury lacked

---

[7] A jury may include within a defendant's individually attributable drug amounts the defendant's own acts as well as his coconspirators' reasonably

sufficient evidence to find that he conspired to possess, distribute, or manufacture either 280 grams of crack cocaine[8] or 5 kg of powder cocaine. Thus, Ellis argues, we must reverse his conviction.

Ellis builds his sufficiency-of-the-evidence argument on a mistaken legal premise. He assumes that the jury could not convict him for the cocaine-conspiracy count absent its finding that the conspiracy involved at least 5 kilograms of powder cocaine or 280 grams of crack cocaine. But to sustain his conspiracy conviction, the government needed to prove only that Ellis conspired "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense" any amount of either substance. 21 U.S.C. §§ 841(a)(1); 846. And he certainly did so. So, at the very least, Ellis stands properly convicted under 21 U.S.C. § 841(a)(1), (b)(1)(C).[9] *See United States v. Cruse*, 805 F.3d

---

foreseeable acts in furtherance of the conspiracy. *See United States v. Morales*, 108 F.3d 1213, 1226 (10th Cir. 1997) ("Where the sentencing court determines a defendant was directly involved in the distribution of a quantity of drugs sufficient to invoke a mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(A), the quantity of drugs reasonably foreseeable to the defendant is irrelevant.").

[8] The government has a much stronger case to support a sufficiency-of-the-evidence argument for the crack cocaine. The crack-cocaine amount rests not on Mexican-cartel liability but instead on the crack cooking and sales by Ellis, Tatum, and Theoplis. But we need not decide whether sufficient evidence exists or not. The government failed to obtain a jury finding that 280 grams of crack cocaine were individually attributable to Ellis, so it must show the resulting error under *Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013), was harmless beyond a reasonable doubt.

[9] This also disposes of Ellis's alternative argument that even if sufficient evidence supported his conviction (for conspiring to distribute and manufacture at least 5 kilograms of powder cocaine and 280 grams of crack cocaine), the jury may have convicted not on the sufficient evidence of those amounts individually

795, 817 (7th Cir. 2015) (concluding that "drug quantity is not an element of a drug conspiracy under § 841(a)(1)"); *United States v. Daniels*, 723 F.3d 562, 572 (5th Cir. 2013) (concluding that the government's failure to prove 5 kilograms of powder cocaine affected the sentence but did not undermine the conviction); *United States v. Collins*, 415 F.3d 304, 314 (4th Cir. 2005) (concluding that conviction under 21 U.S.C. § 846 was sound despite the government's failure to prove the charged amount of crack cocaine); *United States v. Vazquez*, 271 F.3d 93, 105 (3d Cir. 2001) (en banc) (concluding that for an indictment charging 5 kilograms of powder cocaine, courts may sentence for a lesser-included offense when the government's proof doesn't support that weight).[10]

### 2.    Sixth Amendment: *Alleyne*

On appeal, Ellis contends that the district court violated his "Sixth Amendment rights by imposing a life sentence on the conspiracy count without a required factual finding by the jury—that it was reasonably foreseeable to Mr. Ellis that other members of the charge [sic] conspiracy would distribute more than 280 grams of cocaine base and five kilograms of cocaine." Appellant's Opening Br. at 17–18. Ellis argues that the district court erred by sentencing him under § 841(a)(1), (b)(1)(A) without obtaining the jury's findings of the weight of powder and crack cocaine reasonably foreseeable to him.

---

attributable to him, but instead on amounts that were not individually attributable to him.

[10] *See also United States v. Cernobyl*, 255 F.3d 1215, 1218 (10th Cir. 2001) ("Federal courts have historically construed the provisions of § 841(a) as the substantive elements of the offense . . . .").

21

The government argues that Ellis waived this issue by inviting any error in the verdict form. So we must examine how the verdict form was proposed and approved. We note that the district court told counsel at the jury-instruction conference that "the main feedback" it had received after e-mailing a verdict form with spaces for the jury to find cocaine amounts attributable to individual defendants was that the verdict form should not leave spaces for the jury to make those findings. R. vol. V (3165) at 1452. The district court mistakenly agreed that this feedback correctly stated the law. So the district court advised that it had "prepared a revised verdict form which omits any reference to the drug quantities." *Id*. Based on this discussion, the government contends that Ellis rejected the original verdict form with spaces for the jury to make cocaine-quantity findings, thus waiving appellate review of the verdict form.

We disagree with the government's position. We note that after the district court asked counsel if any party objected to the verdict form, Ellis's counsel simply responded, "None on behalf of Mr. Ellis, Your Honor." *Id.* By declining to object, a defendant does not knowingly waive an error. Nothing shows that Ellis's counsel even provided "feedback" about the verdict form. *Id.* We see nothing showing that Ellis's counsel proffered a verdict form without drug quantities to the district court or persuaded the district court to adopt one like that. *See United States v. Sturm*, 673 F.3d 1274, 1281 (10th Cir. 2012) (barring review under the invited-error doctrine where the defendant proffered the very instruction he attacked on appeal). So Ellis did not invite error as the government contends.

In *Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013), the Supreme Court held that "any fact that increases the mandatory minimum [sentence] is an 'element' that must be submitted to a jury."[11] Put another way, the Court held that a district court violates the Sixth Amendment if it imposes a sentence based on a judge-found (and not a jury-found) fact that increases a minimum sentence. *See id.* at 2163–64. Thus, in *Alleyne*, the Supreme Court reversed a mandatory-minimum sentence increased from five to seven years under 18 U.S.C. § 924(c)(1)(A)(ii) for the defendant's having brandished a firearm. *Id.* It did so because the district court, and not the jury, had found this fact that increased the mandatory-minimum sentence. *Id.* at 2163.[12]

In *Alleyne*, the defendant's "brandishing" of the firearm was plainly an element of the crime. *See id.* at 2156; 18 U.S.C. § 924(c)(1)(A)(ii). But Ellis's increased mandatory-minimum sentence depended on conspiracy-cocaine amounts, not the manner of using a firearm. So to succeed on his *Alleyne* argument, Ellis must

---

[11] *Alleyne* overruled *Harris v. United States*, 536 U.S. 545 (2002), where the Court "held that judicial factfinding that increases the mandatory minimum sentence for a crime is permissible under the Sixth Amendment." 133 S. Ct. at 2155.

[12] The government charged the brandishing element, and a special-verdict form gave the jury the opportunity to find that Alleyne had indeed brandished the firearm. The jury found that Alleyne had used the firearm but left blank the space indicating that Alleyne had brandished it. *Alleyne*, 133 S. Ct. at 2156; *see* Indictment, *United States v. Alleyne*, 3:10-cr-00134-REP-1 (E.D. Va. May 5, 2010), Verdict Form, *United States v. Alleyne*, 2:10-cr-00134-REP-1 (E.D. Va. Sept. 7, 2010). So it is not enough for the government to argue that a guilty verdict on a conspiracy count charging 5 kilograms of powder and cocaine and 280 grams of crack cocaine satisfies the government's obligation to prove that element. As in *Alleyne*, merely charging the fact that increases the mandatory-minimum sentence is not enough—the jury must make that fact finding.

23

still show that individually attributable cocaine amounts are an element of the cocaine-conspiracy charge. On this point, the government asserts that "this Court has not issued a published decision [after *Alleyne*] expressly stating what determination the jury must make when a defendant is charged with an offense that carries a statutory mandatory-minimum penalty." Appellee's Br. at 29–30. But the government is mistaken.

In *United States v. Dewberry*, 790 F.3d 1022 (10th Cir. 2015), decided two years after *Alleyne*, we said that, because 280 grams of crack cocaine would increase the statutory mandatory-minimum sentence, that drug amount "was an element of the offense and had to be proved at trial." *Id.* at 1029 (citing *Alleyne*, 133 S. Ct. at 2158). In *Dewberry*, the district court properly had the jury make a special finding beyond a reasonable doubt about the amount of crack cocaine individually attributable to the defendant. *Id.* at 1029. The jury found that he had conspired to distribute at least 280 grams of crack cocaine. *Id.* In evaluating the defendant's sufficiency-of-evidence challenge, we said that "[a] defendant can be held 'accountable for that drug quantity which was within the scope of the agreement and reasonably foreseeable' to him." *Id.* at 1030 (quoting *United States v. Arias-Santos*, 39 F.3d 1070, 1078 (10th Cir. 1994)).[13] We concluded that the government had presented sufficient evidence to

---

[13] Though *Dewberry* was decided after Ellis's trial, he gets any benefit from its ruling because it was decided while his case is on direct appeal. *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987). And Ellis could even rely on *United States v. Stiger*, 413 F.3d 1185 (10th Cir. 2005), which directed that in setting a drug sentence, the district judge "may determine the 'floor' by finding the precise drug quantity attributable to each coconspirator." *Id.* at 1193. Though *Alleyne* reassigned this role to the jury, the

prove that the defendant "could have foreseen that [his coconspirator] would convert powder cocaine into 280 grams or more of crack cocaine." *Id*. at 1030.

In view of the interplay between *Alleyne* and *Dewberry*, we hold that the district court committed *Alleyne* error by convicting and sentencing Ellis on 21 U.S.C. § 841(b)(1)(A) without the jury's having found his individually attributable amount of cocaine as at least 5 kilograms of powder cocaine or 280 grams of crack cocaine.[14] So we turn now to whether this *Alleyne* error requires a reversal. In doing so, we must first determine what standard of review applies. And that depends on whether Ellis preserved an objection in the district court to the *Alleyne* error.

In determining whether Ellis preserved an *Alleyne* objection, we must determine when an *Alleyne* error arises. Here, the *Alleyne* error arose when the district court sentenced Ellis to a life sentence under 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 851. We see no reason to require that Ellis have objected during trial to the jury instructions or the general-verdict form to preserve an *Alleyne* objection. If

measure stays the same—drug quantities for minimum sentences must be attributed individually.

[14] The drug weights under 21 U.S.C. § 841(a)(1), (b)(1)(A), (B), and (C) establish different crimes, *United States v. Jones*, 235 F.3d 1231, 1236 (10th Cir. 2000), but the statute does not say whether the drug weights are those of the conspiracy as a whole, or those of each defendant's individually attributable amounts. We note that, at least for now, one circuit applies the conspiracy-wide amount for both maximums and mandatory-minimum sentences under this section. *See United States v. Gibson*, 2016 WL 6839156, at *2 (6th Cir. Nov. 21, 2016) (recognizing that conspiracy-wide liability for limited-amount coconspirators "may appear unjust" and does not "serve the drug statute's underlying purpose of more severely punishing larger-amount drug dealers," the court declared itself bound by its precedent) (citing *United States v. Robinson*, 547 F.3d 632, 638 (6th Cir. 2008), *rehearing en banc granted*, 854 F.3d 367 (2017)).

25

the government wanted a heightened sentence under that subsection, it was obliged to ensure the jury received proper jury instructions and a special-verdict form with spaces enabling the jury to find Ellis's individually attributable powder and crack-cocaine amounts. *See United States v. Haines*, 803 F.3d 713, 740 (5th Cir. 2015) (concluding that defendants' challenge at their sentencing hearing to their mandatory minimum sentences based on conspiracy-wide heroin amounts, though not raised with an ideal level of specificity, were timely and sufficient to preserve their objections); *United States v. Pizarro*, 772 F.3d 284, 296 (1st Cir. 2014) (concluding that defendant preserved an *Alleyne* objection even though he did not object until sentencing, reasoning that a party is not obliged to object to something "inimical to his cause," ensuring his eligibility for a longer sentence) (quoting *United States v. Pérez–Ruiz*, 353 F.3d 1, 14 (1st Cir. 2003)). The district court did not commit an *Alleyne* error until it subjected Ellis to an increased mandatory-minimum sentence without the jury's attributing at least 280 grams of crack cocaine to Ellis individually.[15]

---

[15] Had the district court sentenced Ellis to the mandatory-minimum term for conspiracy-wide cocaine amounts—10 years—that sentence would have fallen within the § 841(a)(1), (b)(1)(C) range of 0 to 30 years. In that circumstance, the *Alleyne* error might have been harmless. *See United States v. Long*, 748 F.3d 322, 330 (7th Cir. 2014). But here the *Alleyne* error led to a life-without-release sentence under § 851 that never could have happened otherwise. The problem is not with the fact of the prior felony convictions, *see Almendarez-Torres v. United States*, 523 U.S. 224, 243 (1998) (prior convictions are not facts increasing a sentence that require jury findings), but with the sentencing increase made available by the *Alleyne* error.

Next, we must determine whether Ellis raised an *Alleyne* objection before the district court sentenced him. He could do so by invoking the applicable decision (here, *Alleyne*) "or by claiming that 'the issue of drug quantity should go to the jury, . . . that an element of the offense was not proved, that the judge cannot determine quantity, or that quantity must be proved beyond a reasonable doubt (and not by a preponderance of the evidence).'" *United States v. Lott*, 310 F.3d 1231, 1240 (10th Cir. 2002) (omission in original) (quoting *United States v. Candelario*, 240 F.3d 1300, 1304 (11th Cir. 2001)).

Appearing pro se at the sentencing hearing, Ellis raised a sufficient *Alleyne* objection to the district court's sentencing him on 280 grams or more of crack-cocaine without a jury finding that he was individually responsible for this amount:

> I don't understand why I'm here today. And for the jury to find me guilty, I didn't understand because there was no amount – I didn't even – the jury transcripts, it was no amount to say if I was guilty of 280 grams. I mean, even the videos that I was in does not show me specifically with crack cocaine in possession selling to no one. You know.

> * * *

> And I was never shown to be convicted by the jury by a certain drug amount because 280 grams, there's never no evidence, to my knowledge, that's being brought up.

R. Vol. V (3165) at 1644, 1686.

In addition, we conclude that Ellis sufficiently raised an *Alleyne* objection to the district court's sentencing him on five kilograms or more of powder cocaine without a jury finding. In a motion hearing five months before his sentencing hearing, Ellis argued that he should not be held accountable for cocaine distributions by the Mexican cartel and

27

its distributors—"I didn't know none of these dudes." *Id.* at 1591. He complained that his attorney didn't present to the jury that "this is a conspiracy here and it's another case here, so, I mean, you ought to separate Mr. Ellis from this conspiracy[.]" *Id.* at 1593.

And at his sentencing hearing, Ellis complained that for his "guilty verdict [to] show that Perez and I combined to sell drugs is false because I don't know him and he stated on the stand that he doesn't know me." *Id.* at 1641. In arguing that appointing him new counsel would not delay the sentencing, Ellis argued that "[i]t would probably take them a week, two week's time to look at what I was involved in to separate me from the rest of the conspiracy." *Id.* at 1652. Objecting to being held accountable for other defendants' drugs, Ellis said, "So the amount of drugs that's been placed on me, I wouldn't want to call it so much as ghost dope because I didn't have it. But it was presented in the courtroom. But I don't know whose it was, but I never was in possession of it or seen doing anything with a certain amount." *Id.* at 1664. Ellis continued to object to being held accountable for cocaine in an overbroad conspiracy charge in these words: "And it was kind of like a lot easier for, I guess, the prosecutor to get the whole community wrapped up in one, tie them all in one to get it over with fast. And I don't feel like everyone was connected." *Id.*

Because the district court committed a constitutional error by not obtaining the jury's finding on an element of the crime, we turn for guidance to *Neder v. United States*, 527 U.S. 1 (1999). In that case, the district court mistakenly determined that materiality was not an element of certain federal fraud statutes. *Id.* at 4. That meant that the jury never found that element beyond a reasonable doubt. For this error, the Court applied a

28

constitutional harmless-error standard, one requiring the government to prove harmlessness beyond a reasonable doubt (as opposed to a structural-error standard requiring reversal per se). *Id*. at 12–13, 15. The Court found this standard met because the defendant "did not contest the element of materiality at trial," and did not "suggest that he would introduce any evidence bearing upon the issue of materiality if so allowed." *Id*. at 15. The Court required that the evidence be "uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error." *Id*. at 17. And the Court set the test for affirmance as "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id*. at 15 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

### i.    *Powder-Cocaine Conviction*

We first turn to Ellis's conviction for conspiracy to distribute more than 5 kilograms of powder cocaine. Despite the government's cartel-heavy presentation at trial, it has abandoned that approach on appeal. And when those cartel amounts—hundreds of kilograms[16]—are stripped away, the government cannot show that the *Alleyne* error was harmless beyond a reasonable doubt. Ellis contested his liability for at least five kilograms of powder cocaine, and the government didn't introduce overwhelming

---

[16] On direct examination, Officer Eric Jones of the Kansas City Police Department estimated that Hector Aguilera was responsible for hundreds of kilograms of cocaine. R. Vol. IV at 2278.

29

evidence to prove that this amount was individually attributable to him. Even the presentence report, applying a preponderance standard, fell short of this mark.[17]

## ii.    *Crack-Cocaine Conviction*

We next ask whether the government can show harmless error beyond a reasonable doubt with the necessary overwhelming evidence that Ellis conspired to manufacture or possess with intent to distribute and to distribute 280 grams of crack cocaine.[18] Here, unlike with its Mexican-cartel powder-cocaine evidence, the government can rely on evidence more particular to Ellis—the crack cocaine cooked and sold by Tatum, Ellis, and Theoplis. The government points to the controlled buys from Tatum and Ellis totaling 25.3 grams. But that still leaves the government needing to show overwhelming evidence of another 254.7 grams needed to sustain the district court's sentence. And here, Ellis contested this element at sentencing, and the record shows that the government's proof of this remaining crack-cocaine amount is far from "uncontested and supported by overwhelming evidence." *Neder*, 527 U.S. at 17.

To show that 280 grams of crack cocaine are individually attributable to Ellis, the government relies primarily on the testimony of Ellis's nephew, Theoplis.

---

[17] The PSR attributed to Ellis a total of 4,167 grams of cocaine from his and Tatum's months of cocaine purchases from Sykes. Because of this calculation, we do not review the evidence of these cocaine-powder buys in detail.

[18] Because of the government's cartel-heavy presentation to the jury, and its failure during closing argument or rebuttal closing even to mention 280 grams of crack cocaine, we have doubts whether the jury convicted him of a crack-cocaine conspiracy of the aggravated crime under 21 U.S.C. § 841(b)(1)(A).

Theoplis responded affirmatively to the government's question whether the powder cocaine Ellis purchased was "always cooked into crack cocaine."[19] R. vol. V (3165) at 678. But Theoplis admitted that he had just once seen Ellis cook powder cocaine into crack. Theoplis also testified that he had once seen Tatum cook crack at Tatum's girlfriend's house, after complying with Tatum's request that Theoplis bring baking soda. Theoplis also testified that neither he, Tatum, nor Ellis bought crack cocaine. Finally, Theoplis testified that he sold "pieces" of crack cocaine for $10 or $20, and that Tatum and Ellis sold "weight"—meaning sixteenth- or eighth-ounce amounts. *Id*. at 683–84.

On appeal based on Theoplis's testimony, the government argues that Ellis and Tatum cooked all their purchased powder cocaine into crack. If so, the government would have a strong basis to argue that Ellis and Tatum conspired to manufacture and distribute at least 280 grams of crack cocaine.

But we are reviewing for constitutional harmless error, not for sufficiency of the evidence. And Theoplis's testimony does not provide the "uncontested and overwhelming evidence" necessary for us to find the *Alleyne* error harmless beyond a reasonable doubt. In arguing otherwise, the government points us to two cases. But as discussed below, in both cases the government presented much stronger evidence of an omitted offense element than the government did here.

---

[19] As mentioned, at arrest Ellis had a variety of drugs and paraphernalia, which included a small amount of powder cocaine but no crack.

First, in *Pizarro*, 772 F.3d at 298, the government presented overwhelming evidence that far exceeded the drug amount necessary to trigger the mandatory-minimum sentence. Law-enforcement officials had seized 81 kilograms of cocaine from luggage at the airport. *Id.* at 299. Further, multiple other witnesses testified that Pizarro had personally handled more than 5 kilograms of powder cocaine. *Id.* Because overwhelming evidence supported Pizarro's responsibility for more than 5 kilograms of powder cocaine, the *Alleyne* error was harmless beyond a reasonable doubt. *Id.*

Second, in *United States v. Mann*, 786 F.3d 1244 (10th Cir. 2015), we affirmed a defendant's increased mandatory-minimum sentence under 18 U.S.C. 924(c)(1)(A)(iii) because the evidence was "overwhelming" that Mann had discharged a firearm—an element omitted from the jury instructions. *Id.* at 1251–52. In a recorded interview with FBI agents played to the jury, Mann admitted several times that he had discharged his firearm. *Id.* at 1251. And on appeal, Mann conceded that the jury would have "found the mere fact of discharge of a firearm" had the verdict form asked the jury to answer that question.[20] *Id.* at 1251–52. *See also United*

---

[20] In a Fed. R. App. P. 28(j) letter, the government also cites *United States v. Morris*, 784 F.3d 870, 875 (1st Cir. 2015), as "persuasive support" for its overwhelming-evidence argument. In *Morris*, the defendant's counsel conceded during closing argument that the jury should attribute 4 transactions to him, each with 62 grams of powder cocaine, and that the jury could attribute crack cocaine from those 248 grams of crack on a 1:1 ratio. 784 F.3d at 875. The First Circuit had no trouble finding overwhelming evidence of at least another 32 grams of crack cocaine, noting that Morris himself testified that he was involved "in about eight other drug transactions of at least 28 grams each." *Id.* at 876. On the other hand, Ellis's counsel disputed the cocaine amounts during trial, and Ellis himself did so at sentencing.

*States v. McIvery*, 806 F.3d 645, 651 (10th Cir. 2015) (quoting *Morris*, 784 F.3d at 874) (stating the government must show "a corpus of evidence such that no reasonable jury could find, based on the record, that the [drug] quantity was less than that required for the mandatory minimum to apply").

Here, Ellis contested conspiring to manufacture and distribute at least 280 grams of crack cocaine. Our review of the record does not persuade us that the government offered overwhelming evidence to satisfy this omitted element "such that the jury verdict would have been the same absent the error." *Neder*, 527 U.S. at 17. Put another way, the government has not presented "a corpus of evidence such that no reasonable jury could find, based on the record, that the [drug] quantity was less than that required for the mandatory minimum to apply." *McIvery*, 806 F.3d at 651 (quoting *Morris*, 784 F.3d at 874).

## C.    The Government's *United States v. Stiger* Argument

### 1.    How *Stiger* Fits into the Analysis

Taking a wide turn around these *Alleyne* problems, the government asserts that this circuit "has adopted the conspiracy-wide approach for statutory maximums." Appellee Br. at 29; 57. The government treats the general verdict as a jury finding that the conspiracy as a whole involved at least five kilograms of powder cocaine and

---

Certainly, Ellis never admitted that he was involved with either 5 kilograms of powder cocaine or 280 grams of crack cocaine.

280 grams crack cocaine.[21] From this, the government implicitly argues that the conspiracy conviction sets a 10-to-life sentencing range under § 841(b)(1)(A), which authorizes Ellis's life sentence. Because the government relies on *United States v. Stiger*, 413 F.3d 1185 (10th Cir. 2005) to render the *Alleyne-Dewberry* problem moot, we examine *Stiger* in detail.

In *Stiger*, the court reviewed a conviction in a much smaller conspiracy than charged in Ellis's case. 413 F.3d at 1189. Stiger was intimately involved in the conspiracy's workings. For example, he helped prepare drugs for shipping and assisted in transporting the drugs as well as transferring large sums of money. *Id*. As Ellis did here, Stiger received a mandatory life sentence because of the conspiracy's drug weight and two prior felony convictions. *Id*. at 1191.

On appeal, Stiger argued that the district court had violated his Sixth Amendment rights "by not requiring the jury to make a specific finding as to the amount of drugs for which he was personally responsible." *Id*. In that case, unlike here, the jury had at least found that the conspiracy as a whole had trafficked more than 5 kilograms of powder cocaine. *Id*. The court declared that Stiger had raised an issue of first impression in our court—"whether a jury, after *Apprendi* and *Booker*,

---

[21] But the government cannot excuse a lack of a jury finding of an element (here drug weight) by relying on a guilty verdict for an indictment count charging that element. For instance, in a prosecution under 18 U.S.C. § 924(c)(1)(a)(ii), as in *Alleyne*, the government is not excused from obtaining a jury finding on "brandishing" by charging that element in the indictment. *See, e.g.*, *United States v. Kiel*, 658 F. App'x 701, 705, 710 (5th Cir. 2016); *United States v. McKinley*, 732 F.3d 1291, 1293, 1297 (11th Cir. 2013); *United States v. Mack*, 729 F.3d 594, 607-08 (6th Cir. 2013). Here, the jury did not make a finding of the cocaine quantities charged, let alone that those quantities were reasonably foreseeable to Ellis.

must determine the amount and type of drug attributable to individual coconspirators rather than simply attributable to the entire conspiracy." *Id.* at 1192. We joined five other circuits[22] in announcing a rule that "in the conspiracy context, a finding of drug amounts for the conspiracy as a whole sets the maximum sentence that each coconspirator could be given." *Id.* (citing *Derman v. United States*, 298 F.3d 34, 42 (1st Cir. 2002)). We then left it to the district judge to "determine the 'floor' by finding the precise drug quantity attributable to each coconspirator." *Id.* at 1193.

We don't read *Stiger* as giving an unqualified rule that, in wide global conspiracies as charged here, the lowest street-level dealers are automatically subject to the same maximum penalties as drug kingpins. Indeed, in *United States v. Evans*, 970 F.2d 663, 670 (10th Cir. 1992), decided 13 years before *Stiger*, we noted that defendants must "have a general awareness of both the scope and the objective of the

---

[22] Notably, of these five circuits, those that have revisited the issue post-*Alleyne* have not reached *Stiger*'s result. *See Cruse*, 805 F.3d at 817 (concluding that the district court erred in telling the jury that the two defendants were responsible for the cocaine involved in the conspiracy and all acts of the coconspirators in furtherance of the conspiracy and not telling the jury that the acts must be reasonably foreseeable to the two defendants); *Haines*, 803 F.3d at 740–42 (though stating that "for determining statutory minimum and maximum sentences, our cases always have limited the defendant's liability to the quantity of drugs with which he was directly involved or that was reasonably foreseeable to him," the court went on to say that whether conspiracy-wide amounts apply to determine statutory maximums is "a bridge we need not cross today"); *Pizarro*, 772 F.3d at 293 (explaining that "[h]enceforth, under *Alleyne* and *Apprendi*, the jury must find the mandatory-minimum and statutory-maximum triggering elements," in drug cases based on drug quantity). And another of the cited circuits reached a different result even earlier. *Collins*, 415 F.3d at 314 (reversing drug sentence because "the district court's sentence effectively attributed to Collins, an individual member of the conspiracy, the quantity of cocaine base distributed by the entire conspiracy").

enterprise to be regarded as a coconspirator." And we followed those words with a general limitation on a conspiracy's reach:

> This is not to say, however, that a defendant may be convicted of a conspiracy that defies common sense simply because he or she possesses a general awareness of the breadth of its illegal activities. For example, at oral argument, the government suggested that a drug dealer who knows that his supply can be traced to the Medillin cartel has joined a vast conspiracy with the members of the cartel to distribute crack illegally for profit. Under such an approach, a small-time drug dealer could be held responsible for all of the drugs originated by the cartel for sentencing purposes, resulting in a guaranteed life sentence. Such an approach would pervert the concept of conspiracy. Mere knowledge of illegal activity, even in conjunction with participation in a small part of the conspiracy, does not by itself establish that a person has joined in the grand conspiracy.

*Id.*

Under the government's reading of *Stiger*, any prosecution built upon a sufficiently wide conspiracy involving a defendant with two prior felony-drug-offense convictions would require a mandatory life-without-release sentence—regardless of how little of the conspiracy-wide drugs are individually attributable to that defendant. For a variety of reasons, we reject that interpretation of *Stiger*.

First, *Stiger* itself found it important that the district court had "determined Mr. Stiger was *integral to the conspiracy* and could be sentenced as though he were responsible for the full drug types and quantities." 413 F.3d at 1192 (emphasis added). And in rejecting Stiger's appeal, we noted that substantial evidence showed that he had taken "*essential and integral steps* to help the organization profit from the sale of illegal drugs." *Id.* at 1194 (emphasis added). We carefully reviewed the evidence against Stiger—extensive testimony about his packaging and coordinating

36

drug shipments, about his sending large amounts of money to the head man in the conspiracy, and about his gruesome torture of a woman concerning a dispute about drug-sale proceeds. *Id.* at 1191. In comparison, we cannot say that Ellis was integral to the vast conspiracy charged in this case. After all, Ellis was a relatively small-time drug dealer, and the Mexican cartel was importing hundreds of kilograms of cocaine into the Kansas City area.[23] We read *Stiger* to say that conspirators who are "integral" to an entire conspiracy can be sentenced at the conspiracy-wide drug amount.

In our view, conspirators are "integral" when their individually attributable drug amounts correspond to the conspiracy-wide drug amounts. This approach reads *Stiger* in closer harmony to our circuit's precedents than does the government's approach. Obviously, *Stiger* did not overrule *Evans* and its prohibition against cartel-wide liability for small participants. *Evans* denounced the sort of conspiracy liability that the government argued to the jury.[24] 970 F.2d at 670. As mentioned, it required that conspiracy convictions obey common sense, requiring more than "a general awareness of the breadth of its illegal activities."[25] *Id.* It described cartel liability for

---

[23] Left unexplained in *Stiger* is how a district court's finding that Stiger was "integral" to the conspiracy is not, under *Apprendi*, a fact that increases the maximum sentence, and so requires a jury finding.

[24] At Ellis's sentencing, the prosecutor explained the government's approach to the case as follows: "As the evidence unfolded, Mr. Ellis wants to say, well, I didn't know Perez-Alcala, and I agree he didn't, but the drugs that Perez-Alcala and Hector Aguilera [the "kingpin"] were getting were ending up in the hands of Marvin Ellis. That's why he's connected." R. Vol. V (3165) at 1668.

[25] On this general-awareness point, the government's examination of cooperating-witness Theoplis is revealing:

small-time drug dealers an approach that "would pervert the concept of conspiracy."

*Id.*

And we decided *Stiger* after we decided other cases imposing a personal-responsibility limitation on conspiracy liability. *See, e.g.*, *Arias-Santos*, 39 F.3d at 1078 (concluding that the defendant "may be sentenced on the basis of cocaine possessed by another conspirator, so long as the amount is within the scope of the conspiracy and foreseeable by [her]"); *United States v. Russell*, 963 F.2d 1320, 1322 (10th Cir. 1992) (quoting *Pinkerton v. United States*, 328 U.S. 640, 646–47 (1946) for the principle that conspirators are responsible only for coconspirators' acts in furtherance of the conspiracy and crimes committed "within the scope of the unlawful project"[26] and thus "reasonably foreseen as a necessary or natural

---

> Q:   Would it be reasonable for you to conclude that the cocaine you were buying on Duce Duce [22nd Street] was coming from some source?
> A:   What do you mean by that?
> Q:   Well, it was coming from somewhere, would you agree with that?
> A:   Correct.
> Q:   Would it be reasonable to conclude that it came from a Mexican source?
> A:   Not that I know of.
> Q:   You don't know?
> A:   I don't know.
> Q:   But you know it came from somewhere?
> A:   Correct.

R. Vol. V (3165) at 727.

[26] In its closing argument, the government told the jury that "it's not important that any particular defendant knew much at all about the overall scope of the conspiracy." R. vol. V. (3165) at 1475.

38

consequence of the unlawful agreement").[27] And our post-*Stiger* cases cite and rely

on these earlier cases too. *See Dewberry*, 790 F.3d at 1030 (determining that

evidence was sufficient to support a crack-cocaine sentence, citing *Arias-Santos*

favorably to conclude that a reasonable jury could find that Dewberry "could have

foreseen that Mr. Webb would convert powder cocaine into 280 grams or more of

crack cocaine").

### 2.    How *Alleyene* Affects *Stiger*[28]

*Alleyne* directly overruled *Stiger* on one point. *Stiger* directed that the district

court, and not the jury, find the sentencing "floor" based on individually attributable

drug amounts. *Stiger*, 413 F.3d at 1193. But the *Alleyne-Dewberry* tandem requires

that the jury make this fact finding if it increases a mandatory-minimum sentence. So

what did *Stiger* mean by the sentencing "floor"? *Id.* Did this reference allow a district

court to ignore the mandatory-minimum sentence associated with the statutory

sentencing range given by the conspiracy-wide drug amount? In other words, if the

jury found that the conspiracy-wide amount was at least 280 grams of crack cocaine,

would *Stiger* open the door to § 841(a)(1), (b)(1)(A) for the maximum life sentence,

---

[27] In *United States v. Allen*, 9 F. App'x 936, 938 (10th Cir. 2001) (unpublished), we said that "because the jury did not determine the amount of drugs attributable to defendant," we could not uphold under *Apprendi* "a conviction for the quantities identified in § 841(b)(1)(A) or (B)[.]"

[28] Judge Hartz joins the opinion in full except for Discussion Section I.C.2, which he does not join.

39

but somehow ignore the corresponding 10-year mandatory-minimum sentence?[29] Obviously, courts have no authority to disregard a statutory sentencing range. So I interpret *Stiger*'s sentencing "floor" to be the mandatory-minimum sentence plus whatever increase a defendant's relevant conduct under the sentencing guidelines gives. I cannot construct a 0-to-life sentencing range by merging § 841(b)(1)(A), (B), or (C).

Until *Alleyne-Dewberry*, *Stiger*'s one-size-fits-all approach, whatever its wisdom, was at least legally permissible (if the "floor" could not go beneath the mandatory minimum). But *Alleyne-Dewberry* changes that. Now, the mandatory-minimum sentence is unhitched from the conspiracy-wide maximum sentence. In a reversal of fortune, *Stiger*'s conspiracy-wide maximum sentence is now limited by the mandatory-minimum sentence's statutory range. For example, if a defendant's individually attributable amount of crack cocaine is 100 grams, that compels a statutory sentencing range of 5 to 40 years, under § 841(b)(1)(B). And even if the conspiracy-wide crack-cocaine amount far exceeds 280 grams, the maximum cannot rise past 40 years without creating a new sentencing range of 5 years to life. Nothing

---

[29] In *Morales*, 108 F.3d at 1225, we stated that "[in] general, 'district courts have broad discretion in sentencing a defendant within the range prescribed by Congress.'" (quoting *United States v. Robertson*, 45 F.3d 1423, 1448 (10th Cir. 1995)).

in § 841(b) suggests that Congress intended us to merge its precise statutory

sentencing ranges in this fashion.[30]

And there lies a problem for the government. To sustain Ellis's life-without-

release sentence, it must show that Ellis's offense is one "involving" at least 280

grams of crack cocaine, 21 U.S.C. § 841(a)(1), (b)(1)(A)(iii), before it can reach a

sentencing range of 10-years-to-life imprisonment. But after *Alleyne-Dewberry*, we

must ask whether the offense involves that much individually attributable cocaine

before imposing the associated sentencing range that includes the 10-year mandatory-

minimum sentence. A conspiracy-wide crack-cocaine finding of 280 grams or more

cannot establish the mandatory-minimum term of 10 years—only jury-found,

individually attributable amounts can authorize that sentence for a defendant. And

absent getting to § 841(a)(1), (b)(1)(A), the government cannot rely on § 851

convictions to increase Ellis's sentence to mandatory life without release.

---

[30] The 5-year term is called a mandatory-minimum sentence for a reason. And the sentencing guidelines apparently agree, because in cases where a statutory minimum exceeds an advisory guideline range, the mandatory-minimum term becomes the guideline sentence. *See* U.S. Sentencing Guidelines Manual § 5G1.1(b). Even so, we recognize that the government has sometimes taken a contrary view without explanation. *See Dewberry*, 790 F.3d at 1033 (noting that the government agreed that a 10-year mandatory minimum sentence from the jury's special-verdict finding that he conspired to distribute 5 kilograms or more of powder cocaine should be reduced to a five-year mandatory minimum sentence under § 841(b)(1)(B) because the PSR found him responsible for less than 5 kilograms); *United States v. Biglow* (*Biglow II*), 635 F. App'x 398, 399 (10th Cir. 2015) (unpublished) (explaining that the government conceded the district court's error in imposing a five-year mandatory-minimum sentence based on a jury verdict finding that the conspiracy as a whole had involved at least 500 grams of powder cocaine, when the district court at sentencing attributed 192 grams to the defendant individually).

### 3. Summary

As stated, we read *Stiger* differently than the government does, and we vacate Ellis's sentence under §§ 841(a)(1), (b)(1)(A) and 851 and remand that count for resentencing under §§ 841(b)(1)(C) and 851.[31] In remanding cases for violations of *Apprendi*, we have ordered that the district court resentence under § 841(a)(1), (b)(1)(C) when the conviction stands but the sentence does not. *See Jones*, 235 F.3d at 1236–37 ("A district court may not impose a sentence in excess of the maximum set forth in 21 U.S.C. § 841(b)(1)(C) unless the benchmark quantity of cocaine base for an enhanced penalty is alleged in the indictment in addition to being submitted to the jury and proven beyond a reasonable doubt."); *see also Vazquez*, 271 F.3d at 98 (explaining that, because "drug quantity was neither submitted to the jury nor reflected in its verdict," "§ 841(b)(1)(C) define[d] Vazquez's prescribed statutory maximum sentence").

## II. Drug-Premises Conviction

Ellis next argues that the evidence was insufficient to support his conviction for maintaining drug-involved premises. Although the indictment charges that this crime occurred "[o]n or about April 27, 2012," Ellis ignores the "on or about" qualifier, concentrating instead on the particular date of April 27, 2012. R. vol. I (3165) at 585. According to Ellis, the government did not prove beyond a reasonable

---

[31] In view of this holding, we have no need to address Ellis's Fifth Amendment argument, one based on his asserted due-process right to avoid an "aggravated conspiracy charge" (longer imprisonment for more drug involvement) "based upon the conduct of others that is not reasonably foreseeable to him." Appellant's Opening Br. at 4.

doubt that he maintained 921 Haskell as a drug-trafficking house on April 27, 2012. The government contends that it proved that Ellis maintained the residence at 921 Haskell for drug-trafficking purposes sometime within a few weeks of April 27, 2012—a time period sufficiently close to April 27 to compel an affirmance.

On appeal, Ellis argues that insufficient evidence supports this count of conviction. Further, he acknowledges that he did not object in the district court on sufficiency-of-evidence grounds. *Id*. In this circumstance, we review Ellis's challenge under the plain-error standard. *United States v. Goode*, 483 F.3d 676, 681 (10th Cir. 2007). To meet his burden under this standard, Ellis must show that the district court committed "(1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights." If Ellis does so, "this Court may exercise discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id*. (quoting *United States v. Kimler*, 335 F.3d 1132, 1141 (10th Cir. 2003)).

We conclude that Ellis has not even shown error. First, as noted, the indictment was not limited to a specific date—instead, it charged Ellis with violating § 856 "on or about April 27, 2012." R. vol. I (3165) at 585. Indeed, the government produced evidence of Ellis's maintaining 921 Haskell as a drug premises during the month before the date charged in the indictment. When an indictment lists a specific date, the government must produce "some evidence which tends to show that the defendant committed the charged offense on 'a date reasonably near to the specified date' alleged in the indictment." *United States v. Charley*, 189 F.3d 1251, 1273 (10th

43

Cir. 1999) (reversing because the evidence showed the defendant's actions from two years before the date listed on the indictment) (quoting *United States v. Castillo*, 140 F.3d 874, 885 (10th Cir. 1998)). Evidence that a defendant committed the crime within a few weeks of the specified date suffices. *Id.* at 1272; *see also Kokotan v. United States*, 408 F.2d 1134, 1138 (10th Cir. 1969) ("[I]f the prosecution proves that the offense was committed within a few weeks of the date, the proof will be deemed sufficient to hold defendant responsible for the charge.").

The government proved that Ellis maintained 921 Haskell as a drug premises within a few weeks of April 27. The jury heard a phone call between Ellis and an unidentified male on April 4, 2012 on a phone line that Ellis, Tatum, and others used for drug sales—some of which took place at 921 Haskell. Whenever, if ever, the spat between Tatum and Ellis ended, Ellis's use of this phone suggests that it had not begun by April 4, 2012. Ellis points to a recorded phone call between Tatum and an unknown male on April 12, 2012, where Tatum says that he and Ellis had a "falling out." R. vol. III (3165) at 2287–88. But the government produced a utility bill for 921 Haskell for service from April 13 to May 14, 2012, still in Ellis's name. Contrary to Ellis's contention that he did not have a "requisite connection" to 921 Haskell, Appellant's Opening Br. at 31, the utility bill—one reasonably near the date listed on the indictment—was evidence upon which the jury could rely in convicting Ellis of this count. *Cf. United States v. Renteria-Saldana*, 755 F.3d 856, 859–60 (8th Cir. 2014) (concluding that the two-level drug-house sentencing enhancement was proper based on, in part, the defendant's having and paying the utility bills for the house).

44

## III.  Conviction for Firearm Possession in Furtherance of Drug Trafficking

Next, Ellis argues that the evidence was insufficient to sustain his conviction under 18 U.S.C. § 924(c) for possessing a firearm in furtherance of a drug-trafficking crime. Ellis contends that the drugs and other items he was carrying—namely, the 2.5 grams of powder cocaine—were for personal use, not distribution.

Ellis acknowledges that he did not move for acquittal, so we again review for plain error. *Goode*, 483 F.3d at 681.

To establish a § 924(c) violation, the government must prove that Ellis (1) committed a drug-trafficking offense (2) and knowingly possessed a firearm (3) "in furtherance of" that crime. *United States v. Nava-Sotelo*, 354 F.3d 1202, 1205 (10th Cir. 2003). To support this conviction, the government must establish "some nexus" between the firearm and the drug-trafficking crime. *United States v. Luke-Sanchez*, 483 F.3d 703, 706 (10th Cir. 2007). The government can use circumstantial evidence to show both an intent to possess the weapon, *United States v. McGehee*, 672 F.3d 860, 871 (10th Cir. 2012), and an intent to distribute drugs, *United States v. Burkley*, 513 F.3d 1183, 1189 (10th Cir. 2008).

We disagree with Ellis that he can show an error that was plain, let alone one that affected his substantial rights. Ellis claims that he had the 2.5 grams of powder cocaine for personal use, not distribution. But based on the evidence, the jury could rationally conclude that, when police arrested him on May 11, 2012, Ellis possessed

the cocaine with the intent to distribute it. After all, the jury knew from the evidence that Ellis was a drug dealer. And in evaluating what Ellis intended to do with the cocaine, the jury could consider that officers recovered from Ellis's bag more evidence of drug dealing than the powder cocaine itself: an empty sandwich-bag box, a digital scale, about 32 grams of synthetic marijuana, 25.8 grams of PCP in a bottle, 3.1 grams of marijuana, 16 mollies (ecstasy/MDMA), and 8 Diazepam pills. *See United States v. Khondaker*, 263 F. App'x 693, 701 (10th Cir. 2008) (unpublished) (holding that jury could conclude that the defendant possessed drugs for retail distribution based on the amount of drugs and the *variety* of drugs found—including crack and powder cocaine, methamphetamine, and ecstasy); *see also United States v. Triana*, 477 F.3d 1189, 1195 (10th Cir. 2007) (describing scales and plastic baggies as "tools of the drug trade"). We affirm Ellis's § 924(c) conviction.

## IV.    Right to Counsel at Sentencing

Ellis next argues that the district court violated his Sixth Amendment right to counsel when it refused to appoint substitute counsel at sentencing and when it found that Ellis had knowingly waived his right to counsel. He asks us to vacate the sentences on all convictions and remand for resentencing after appointment of substitute counsel. Because we remand for a full resentencing, and now order that Ellis receive different counsel to assist him at the resentencing, we conclude that these claims are moot and address them no further.

46

## V.    Supervised-Release Violation

Ellis also filed an appeal in Appeal No. 14-3181 after the district court sentenced him to 24 months for the supervised-release violation. But in his appellate brief, Ellis makes one fleeting mention of this violation in his argument. He asserts that "Ellis is also entitled to substitute counsel in the related case involving the revocation of his supervised release. As noted above, the complete breakdown in communication between Mr. Ellis and Mr. DeHardt continued in the proceedings in that case." Appellant's Opening Br. at 40 n.7.

Ellis's bare assertion is insufficient to preserve this claim for our consideration. *See United States v. Fishman*, 645 F.3d 1175, 1194 (10th Cir. 2011) (concluding that "[w]e will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim" that the appellant "fail[ed] to develop [the] argument or provide any citations to authorities or the record"); *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) (en banc) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived."). Ellis's single footnote is insufficient to trigger our review.[32] We decline to address this argument and affirm Ellis's supervised-release-violation conviction and sentence.

---

[32] Even if Ellis had preserved this argument, we would conclude that Ellis knowingly and voluntarily waived counsel at the revocation-violation sentencing. Before proceeding, the district court asked Ellis whether he wanted to represent himself (to which Ellis responded affirmatively), whether Ellis understood the charge and the maximum sentence, and whether Ellis understood that it was a bad idea to represent himself, especially given his lack of any legal education. Based on these questions, we would conclude that the district court adequately covered topics such as the nature of the charges, the range of punishment, possible defenses, and a

**CONCLUSION**

In Appeal No. 14-3165, we affirm all of Ellis's convictions and all but one of his sentences—the mandatory-life sentence for the cocaine conspiracy. On that sentence, we conclude that the district court committed plain error under *Alleyne* by failing to obtain the jury's findings on the conspiracy's cocaine amounts reasonably foreseeable to Ellis. We further conclude that the district court's errors were not harmless, because the government's evidence was not overwhelming that Ellis could reasonably foresee at least 5 kilograms of powder cocaine in the conspiracy, and that Ellis (and his coconspirators Tatum and Theoplis) manufactured or sold at least 280 grams of crack cocaine. Thus, we reverse Ellis's conspiracy sentence and remand for a full resentencing, subject to the cocaine-conspiracy conviction being resentenced under 21 U.S.C. § 841(b)(1)(C). We affirm all of Ellis's other convictions and sentences. In Appeal No. 14-3181, we affirm Ellis's supervised-release-violation conviction and sentence.

---

disclosure of risks involved in representing oneself pro se before permitting Ellis to proceed pro se at sentencing. *See Turner*, 287 F.3d at 983.